IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ALAN G. ROBINSON,
   Petitioner,

v.         Case No.  3:09cv233/WS/CJK

KENNETH S. TUCKER,[1]
   Respondent.

_____

ORDER and
<u>REPORT AND RECOMMENDATION</u>

   Before the Court is a petition for writ of habeas corpus filed under 28 U.S.C. § 2254.  (Doc. 1).  Respondent filed an answer, submitting relevant portions of the state court record.  (Doc. 22).  Petitioner has not replied, although given the opportunity to do so. (Doc. 24).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the pleadings and attachments before the Court show that petitioner is not entitled to relief, and that the petition should be denied.

BACKGROUND AND PROCEDURAL HISTORY

   On November 19, 2003, petitioner was charged in Escambia County Circuit

---

   [1]Kenneth S. Tucker succeeded Walter A. McNeil as Secretary of the Florida Department of Corrections, and is automatically substituted as the respondent.  Fed.R.Civ.P. 25(d).

Court Case No. 03-CF-5265, with two counts of Battery Upon a Law Enforcement Officer, EMS, or Firefighter (Count 1 involving EMS provider Randy Linschoten, and Count 2 involving EMS provider Alfred Tucker); one count of Assault (Count 3); and one count of Disorderly Intoxication (Count 4).  (Doc. 22, Ex. A).[2]  The offense conduct allegedly occurred on October 31, 2003.  (*Id*.).  On September 3, 2004, petitioner filed a notice of intent to rely upon an insanity defense.  (Ex. C).  Petitioner was convicted of Counts 1, 3 and 4, as charged, after a jury trial.  (Ex. J).  Petitioner's mid-trial motion for judgment of acquittal as to Count 3 (Assault) was granted.  (Ex. G, p. 138).  Sentencing proceedings commenced on September 14, 2005, at which the State submitted exhibits in support of petitioner's enhanced sentencing as a Violent Career Criminal (VCC).  (Exs. L, M).  Following a continuance, sentencing concluded on October 20, 2005, at which the State submitted an additional exhibit in support of enhanced sentencing.  (Exs. N, O).  Petitioner was sentenced as a VCC to concurrent mandatory minimum terms of 10 years' imprisonment on Counts 1 and 2, and to time served on Count 4.  (Ex. N).  Judgment and sentence was rendered on October 20, 2005.  (Ex. P).  The Florida First District Court of Appeal ("First DCA") per curiam affirmed petitioner's convictions and sentences on June 14, 2007, without written opinion.  *Robinson v. State*, 959 So.2d 259 (Fla. 1st DCA 2007) (Table) (copy at Ex. V).

On June 10, 2008, petitioner filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.  (Ex. W).  The Rule 3.850 court denied relief without an evidentiary hearing.  (Ex. X).  The First DCA per curiam affirmed

---

[2]Hereafter, all references to exhibits will be to those provided at Doc. 22, unless otherwise noted.

without written opinion on March 3, 2009.  *Robinson v. State*, 9 So.3d 621 (Fla. 1st DCA 2009) (Table) (copy at Ex. Z).  The mandate issued June 8, 2009.  (*Id*.).

Petitioner filed his federal habeas petition in this Court on May 28, 2009. (Doc. 1).  The petition raises two grounds for relief:  (1) trial counsel was ineffective for failing to object, or move for mistrial, when two State's witnesses violated the trial court's pre-trial ruling by offering lay opinion concerning petitioner's sanity; and (2) petitioner's conviction violates due process because the State's evidence was insufficient to rebut petitioner's affirmative defense of insanity.

## STANDARD OF REVIEW

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. Section 2254(d) provides, in relevant part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal

law," namely, "the governing legal principle or principles set forth by the Supreme

Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538

U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly

established" only when a Supreme Court holding at the time of the state court

decision embodies the legal principle at issue.  *Thaler v. Haynes*, — U.S. —, 130 S.

Ct. 1171, 1173, 175 L. Ed. 2d 1003 (2010); *Bowles v. Sec'y for Dep't of Corr.*, 608

F.3d 1313, 1315 (11th Cir. 2010).

After identifying the governing legal principle(s), the federal court determines

---

[3]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

whether the state court adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)]  does not require citation to our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007).

If the state court decision is not contrary to clearly established federal law, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737-38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from

Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  A state court, however, may "decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]" without running afoul of the "unreasonable application" clause. *Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251 (2009).

When faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See Gill v. Mecusker*,  633 F.3d 1272, 1287 (11th Cir. 2011) (citing *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011)).  The federal court  must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior Supreme Court decision.  *See Richter*, 131 S. Ct. at 786; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).  In sum, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the

merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   As with the "unreasonable application" clause, the federal court applies an objective test.  *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill*, 633 F.3d at 1292.

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and §2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit recently declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record

reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. 930, 127 S. Ct. 2842, 2858. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 131 S. Ct. at 786.

Within this framework, the Court will review petitioner's claims.

## DISCUSSION

Ground 1    Ineffective Assistance of Trial Counsel for Failing to Object, or Move for Mistrial, When State's Witnesses Offered Lay Opinion Concerning Petitioner's Sanity.

On June 23, 2005, petitioner, through counsel, filed a pre-trial motion *in limine* under Fla. Stat. § 90.403,[4] seeking to prohibit any lay witness from "speculati[ng] . . . as to the cause or motivation for any conduct of the Defendant which the witness may have observed." (Ex. F, p. 2). The trial judge, Circuit Judge Michael Allen, heard the motion at the commencement of jury trial proceedings. (Ex. G). The court ruled:

> The concept of a witness testifying as to their opinion that someone they observed was intoxicated or impaired has been approved by the appellate courts. As it related to DUI cases, the appellate courts have

---

[4]Section 90.403 provides: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."

approved witnesses giving their opinion that a person was under the influence of alcoholic beverages to the extent their normal faculties were impaired.  One might question whether that should be approved when that's what the charge is, and that's what the jury is going to decide, but the appellate courts have approved that.  And, you know, whether I necessarily agree with that or not, doesn't matter.  But there certainly have been Appellate Court decisions that have been upheld allowing persons to testify provided it's shown that they have had some experience observing people who have been consuming alcoholic beverages, and are under the influence and are intoxicated.

And if he [the prosecutor] is going to present testimony from someone that says they worked in a bar as a bouncer, then the jury can make – can reach a conclusion as to whether or not that person has enough knowledge and experience to give an opinion.  They can reject that opinion if they choose to.

But if you are asking him to be – if you are asking the State to be prohibited from offering the opinion testimony of any witnesses that the defendant was intoxicated, then I am not going to prohibit that.

If you are asking that before any witness gives the opinion that the behavior was due to intoxication and not due to any other reason, frankly, I don't anticipate that, but that would be something that would require the demonstration of a showing of some knowledge, training, experience, some expertise that would enable one to testify that the behavior was consistent with intoxication but not consistent with a head injury or consistent with some other medical circumstance.

Mr. Robinson [prosecutor], do you anticipate going there with that type of opinion?  Having someone testify that the reason for the behavior was not because of anything other than the intoxication?

MR ROBINSON:  I do intend to ask these witnesses about their medical training, and background, and their experience in dealing with people who are intoxicated.  And how – were the defendant's actions on

this occasion consistent with that.  But as far as any further opinion, I am not going to say that I won't do that.  I am going to see how their testimony plays out, and I may come back in rebuttal and call them.

THE COURT:  If you get to a point where you are going to ask a witness if, in their opinion, regarding whether the behavior was a result of consumption of alcoholic beverage or a result of some other reason, then I will ask you to approach the bench and address it.  We might have to go through a proffer.  We may just have to go through the process of letting you ask questions to demonstrate the person's qualification to offer such testimony, and I will permit voir dire on issue of qualification.

MR. ROBINSON:  I don't think it would be to the point where I would ask them that question, in your opinion, was this due to alcohol and not a head injury.  My question would be have they seen people with head injuries, versus people with alcohol intoxication.  I may ask in their opinion was it more consistent with what they have seen with one or the other.

THE COURT:  All right.  If that's the case, I am not going to prohibit that.  I will not prohibit the State from asking witnesses what their experience has been in observing persons with head injuries, and observing persons who are under the influence of alcoholic beverages, and giving their opinion about the actions of the defendant.

If you get to the point, though, of wanting to have someone offer an opinion that the behavior was caused by consumption of alcoholic beverages and not caused by some other reason, then I want you to approach the bench first and let me know you are going there.

(Ex. G, pp. 11-14).  Petitioner claims that State witness Randy Linschoten , one of the EMS victims, violated the trial court's ruling when Mr. Linschoten testified on re-direct:  "It was clear to all of us that he [petitioner] knew the difference between right and wrong.  Someone with a head injury, that's not even in the ballpark."  (Ex. G, p.

78).  Petitioner claims that State witness Alfred Tucker, the other EMS victim, also violated the trial court's ruling when Mr. Tucker testified:  "Although he [petitioner] did not appear to have any loss of consciousness or anything, or altered mental status, except as influenced by maybe some alcohol." (Ex. G, p. 91).  Petitioner claims the foregoing testimony constituted lay opinions "as to whether petitioner was insane, and to the possible causes of his behavior (intoxication)." (Doc. 1, p. 4D).  Petitioner faults trial counsel for failing to object or move for mistrial on the grounds that the testimony violated the trial court's ruling.

     A.    Clearly Established Federal Law

Ineffective assistance claims are governed by the United States Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  *Strickland* held that a successful claim of ineffective assistance requires a defendant to show both deficient performance by counsel and prejudice resulting from that deficiency  *Id*. at 687, 104 S.Ct. 2052.

"The purpose of ineffectiveness review is not to grade counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*). In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Chandler* at 1314.  Courts must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *see also e.g., Chandler* at 1314 (explaining that the *Strickland* standard compels courts to "avoid second-guessing counsel's performance").

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067.  Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*., at 694, 104 S. Ct. at 2068.  Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698, 104 S. Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, — U.S. —, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Richter*, 131 S. Ct. at 788.  As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id*. (citations omitted).

B.      Federal Review of State Court Decision

Petitioner raised this claim in his Rule 3.850 motion.  Circuit Judge Michael Allen, the judge who presided over petitioner's trial, ruled on petitioner's postconviction motion.  Judge Allen found that neither Mr. Linschoten's nor Mr. Tucker's testimony violated the court's ruling on the motion *in limine*; therefore counsel was not deficient by failing to object.  (Ex. X, pp. 4-5).  Judge Allen further ruled that petitioner failed to establish he was prejudiced by the testimony at issue.  (*Id*., pp. 5-6).  Judge Allen's decision was summarily affirmed by the state appellate court.

Petitioner's contention that the state court unreasonably applied *Strickland* obviously depends upon this Court determining that trial counsel's performance was deficient.  First, however, this Court would have to conclude that Judge Allen misinterpreted his own ruling when he held that the testimony did not violate his ruling on petitioner's motion *in limine*.  This Court will not second-guess the state court on such matters.  *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355 (11th Cir. 2005) ("It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).  The state court's binding determination of its own ruling means that there could not be attorney error or prejudice for counsel's failure to object.  Petitioner's ineffective assistance claim must fail.  *See, e.g.,  Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [defense counsel] objected to the introduction of [the petitioner's] statements based on [state law] – the objection would have been

overruled.  Therefore, [defense counsel] was not ineffective for failing to make that objection.") (citations omitted); *Herring*, 397 F.3d at 1354-55 ("The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [defense counsel] done what [the petitioner] argues he should have done – objected to the State's cross-examination of Meyers. . . Accordingly, with regard to this claim, we hold [petitioner] cannot establish either deficient performance by [counsel] or prejudice.").

The state court's rejection of petitioner's ineffective assistance claim was not contrary to, and did not involve an unreasonable application of the *Strickland* standard.  Nor was the state court's decision based on an unreasonable determination of the facts in light of the state court record.  Petitioner's claim does not warrant federal habeas relief.

Ground 2    Petitioner's Conviction Violates Due Process Because the State's Evidence was Insufficient to Rebut Petitioner's Affirmative Defense of Insanity.

Petitioner claims his conviction violates due process, because the State's evidence of his sanity was legally insufficient to rebut petitioner's *prima facie* showing of insanity established through expert testimony.  (Doc. 1, p. 4).  Petitioner raised this claim on direct appeal.  (Doc. 22, Ex. T).  The state appellate court affirmed petitioner's judgment of conviction, without written opinion.  (Ex. V).

A.    Clearly Established Federal Law

In *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), the Supreme Court declared that the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *Id.*, 397 U.S. at 364, 90 S. Ct. at

1072.  In *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), the Court held that the standard applicable to a state prisoner's claim that the evidence was constitutionally insufficient to support his conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, 443 U.S. at 318-19, 99 S. Ct. at 2788-89, *overruled on other grounds by Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).   The Supreme Court instructed that this standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16, 99 S. Ct. at 2792 n.16.   In *Moore v. Duckworth*, 443 U.S. 713, 714, 99 S. Ct. 3088, 3089, 61 L. Ed. 2d 865 (1979) (per curiam) the Court applied the *Jackson v. Virginia* standard to a state prisoner's claim that the State's evidence was insufficient to prove he was sane at the time of his offense.  443 U.S. at 713-14, 99 S. Ct. at 3089.  The relevant state law in *Moore* required the State to prove the defendant's sanity beyond a reasonable doubt.  The Court deferred to state law governing proof of sanity, including the state rule  permitting the State to rely on lay proof of sanity. *Moore*, 443 U.S. at 714-15, 99 S. Ct. at 3089-90.

A federal habeas court reviewing a state criminal judgment for sufficiency of the evidence must presume the jury resolved any conflicting inferences arising from the facts in favor of the State and against the defendant.  *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").  In other words, the court must defer

to the judgment of the jury in assigning credibility to the witnesses and weighing the evidence. *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001) (citing *Jackson*, 443 U.S. at 326). The test under *Jackson* is a limited one, and it does not require that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt. *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir. 1982); *Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir. 1987) ("The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief.").

B.    Relevant State Law

Under Florida law, battery on an emergency medical care provider requires the State to prove four elements: (1) that petitioner intentionally touched or struck the emergency medical care provider against his will or caused bodily harm to the emergency medical care provider; (2) that the victim was an emergency medical care provider; (3) that the petitioner knew the victim was a medical care provider; and (4) that the victim was engaged in the performance of his duties when the battery was committed. Fla. Stat. § 784.03, 784.07(2)(b); *State v. Granner*, 661 So.2d 89 (Fla. 5th DCA 1995) (citing *Street v. State*, 383 So.2d 900 (Fla. 1980)). Disorderly intoxication requires the State to prove two elements: (1) that petitioner was intoxicated and (2) that petitioner either (a) endangered the safety of another person or property, or (b) caused a public disturbance. Fla. Stat. § 856.011.

Florida law permits a person accused of a crime to raise an affirmative defense that he "at the time of the commission of the acts constituting the offense . . . was insane." Fla. Stat. § 775.027 (2003). Insanity is established when:

(a) The defendant had a mental infirmity, disease, or defect; and

(b) Because of this condition, the defendant:

1.    Did not know what he or she was doing or its consequences; or

2.    Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.

Fla. Stat. § 775.027(1) (2000).  Section 775.027 places the burden of proof on the defendant to "prov[e] the defense of insanity by clear and convincing evidence." Fla. Stat. § 775.027(2) (2000).  This statutory enactment, effective June 19, 2000, *see* Ch. 2000-315, § 1, Laws of Fla., was the law in effect at the time of petitioner's offense conduct and trial.

Prior to enactment of § 775.027, the law in Florida placed the burden of proof regarding sanity on the State:

> In criminal prosecutions a person is presumed sane, and the burden is on the defense to present evidence of insanity. *Hall v. State*, 568 So.2d 882, 885 (Fla. 1990).  If a defendant introduces evidence sufficient to create a reasonable doubt about sanity, the presumption of sanity vanishes and the state must prove the defendant's sanity beyond a reasonable doubt. *Id.*  If the state does not overcome a reasonable doubt, the defendant is entitled to an acquittal. *Fisher v. State*, 506 So.2d 1052, 1054 (Fla. 2d DCA 1987).

*Bourriague v. State*, , 820 So.2d 997, 998 (Fla. 1st DCA 2002); *accord Yohn v. State*, 476 So.2d 123, 126 (Fla. 1985) ("[I]t is not unconstitutional to place the burden on a defendant to prove he was insane at the time of the commission of the offense. However, we have chosen not to place this burden of proof on the defendant in the state of Florida, but as we have said, to create a rebuttable presumption of sanity which if overcome, must be proven by the state just like any other element of the offense." ).  Although the burden of proof was not on the defendant , the defendant

was required, at a minimum, to sufficiently place his sanity in issue by rebutting the presumption of sanity with sufficient evidence to raise a reasonable doubt as to whether he was sane at the time he committed the offense. *See Parkin v. State*, 238 So.2d 817, 822 (Fla. 1970); *Fisher v. State*, 506 So.2d 1052, 1054 (Fla. 2nd DCA 1987) ("In Florida a person is presumed sane, and in a criminal prosecution, the burden is on the defendant to present evidence of insanity. Where the defendant introduces evidence sufficient to present a reasonable doubt of sanity, the presumption of sanity vanishes and the accused's sanity must be proven beyond a reasonable doubt by the state.") (citations omitted). Further, although the burden of proof was changed by Fla. Stat. § 775.027, the test for insanity remained the same. *See Fisher v. State*, 506 So.2d 1052, 1054 (Fla. 2nd DCA 1987) (stating Florida's test for insanity prior to the enactment of § 775.027: "In Florida, the test for insanity as a defense to a criminal charge is whether at the time of the offense the defendant had a mental infirmity, disease, or defect and, as a result, did not know what he was doing or did not know what he was doing was wrong.") (citing *State v. McMahon*, 485 So.2d 884 (Fla. 2d DCA 1986)).

C.    Analysis

This case contains an unusual twist, because although Florida law at the time of petitioner's offense conduct (and trial) required petitioner to prove his affirmative defense of insanity by clear and convincing evidence, Fla. Stat. § 757.027(2) (2000), the state trial court did not apply § 775.027(2) to petitioner's case. Rather, the trial court applied the more favorable law in existence prior to that statute, and instructed petitioner's jury:

> An issue in this case is whether Alan Gray Robinson was insane when the crime allegedly was committed. A person is considered to be insane

when first, he had a mental infirmity, disease or defect; and second, because of this condition he did not know what he was doing or its consequences; or although he knew what he was doing and its consequences, he did not know it was wrong.

All persons are presumed to be sane.  However, if the evidence causes you to have a reasonable doubt concerning the Defendant's sanity, then the presumption vanishes and the State must prove beyond a reasonable doubt that the defendant was sane.

In determining the issue of insanity, you may consider the testimony of expert and nonexpert witnesses.  The question you must answer is not whether the defendant is insane today or has ever been insane, but simply if the defendant was insane at the time the crime allegedly was committed.

If you find that Alan Gray Robinson committed the crime, but have a reasonable doubt that he was sane at the time, then you should find him not guilty by reason of insanity.

(Ex. U, p. 2 (citing trial transcript at p. 268); Ex. K; *see also* Doc. 22, p. 20).

Respondent contends that this Court's habeas review must be made in reference to Florida law as it existed at the time of petitioner's offense conduct and trial, and that petitioner's contention that the state courts erred in denying his claim that the evidence was insufficient to disprove his affirmative defense does not present a colorable habeas corpus claim, because Florida law had removed this burden of proof from the State.  (Doc. 22, p. 21).  Respondent alternatively argues that even if petitioner's claim could be deemed to present a federal constitutional issue, petitioner is not entitled to relief, because after viewing the evidence in the light most favorable to the State, a rational fact finder could have found petitioner guilty beyond a reasonable doubt even if the State bore the burden on the issue of petitioner's sanity.

(Doc. 22, pp. 22-31).

> i.     Assuming Fla. Stat. § 775.027(2) is the relevant state law and that petitioner bore the burden of proving insanity

If this Court determines that Fla. Stat. § 775.027(2) applies to petitioner's case and governs the burden of proof on the issue of sanity, the Court must find that petitioner is not entitled to federal habeas relief.  Section 775.027(2) required petitioner to prove his affirmative defense of insanity by clear and convincing evidence, Fla. Stat. § 757.027(2) (2000).  Petitioner does not argue that he met that burden.  Petitioner's argument that the State failed to rebut his *prima facie* showing of insanity fails to present any colorable basis for relief, because the State had no burden on the issue.

Even liberally construing petitioner's claim as one that his evidence of insanity was sufficient to warrant acquittal under Fla. Stat. § 775.027(2), petitioner fails to present a cognizable claim on federal habeas review.  The Supreme Court has not recognized a federal constitutional right to acquittal upon evidence of insanity. *Medina v. California*, 505 U.S. 437, 449, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992) ("[W]hile the Due Process Clause affords an incompetent defendant the right not to be tried, . . . we have not said that the Constitution requires the States to recognize the insanity defense.") (citing *Powell v. Texas*, 392 U.S. 514, 536–537, 88 S. Ct. 2145, 2156-2157, 20 L. Ed. 2d 1254 (1968)."); *e.g., Pop v. Yarborough*, 354 F. Supp. 2d 1132, 1137 (C.D. Cal. 2005) ("The United States Supreme Court never has recognized a federal constitutional right to present an insanity defense."); *Parkin v. State*, 238 So.2d 817, 822 (Fla. 1970) ("There is no constitutional right to plead the defense of insanity.").

Although due process "protects the accused against conviction except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," *Winshi*p, 397 U.S. at 364, challenges on the non-elements of an offense do not generally implicate due process and are not reviewable in a federal habeas proceeding.  Petitioner's sanity, although relevant to *mens rea*, was not an element of the crimes for which he was convicted, and insanity does not negate any element of battery on an emergency medical care provider or disorderly intoxication. Petitioner's present challenge concerning whether his evidence of insanity was sufficient to support an acquittal, presents purely a state law question.  A state prisoner is entitled to federal habeas relief only if he is held "in custody in violation of the Constitution or laws or treaties of the United States."  *See* 28 U.S.C. § 2254(a). A challenge to a conviction must therefore do more than pose a question of state law, for such a challenge alleges no deprivation of federal rights and does not merit habeas relief.  *See Engle v. Isaac*, 456 U.S. 107, 119, 102 S. Ct. 1558, 71 L. Ed.2d 783 (1982); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  *See, e.g., Gall v. Parker*, 231 F.3d 265, 307 (6th Cir. 2000) (finding claim that evidence was insufficient to establish sanity was not cognizable under § 2254 where sanity was not an element of the crime), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n. 3 (6th Cir. 2003); *see also Battie v. Estelle*, 655 F.2d 692, 702 n. 23 (5th Cir. 1981)(denying habeas relief for challenge to sufficiency of evidence of sanity because there is no federal constitutional right to present the defense of insanity); *Pop v. Yarborough*, 354 F. Supp. 2d 1132, 1138 (C.D. Cal. 2005) (holding that California state prisoner's claim – that the trial court's finding that he was sane at the time of his crimes was

based on insufficient evidence and therefore denied petitioner due process of law – was really a challenge based on state law and was not cognizable on federal habeas review; although an insanity defense may be relevant to the element of *mens rea*, sanity was not an element of the crime under California law, and prisoner did not dispute that the prosecution met its burden of proving that he committed the crimes; the prisoner merely challenged the trial court's finding that he did not introduce sufficient evidence to establish he was insane).

Even assuming *arguendo* that petitioner's challenge is cognizable on federal habeas review, the Supreme Court has not established a standard for reviewing a sufficiency of the evidence claim where, as here, the criminal defendant bears the burden of proving the insanity defense. Although *Moore v. Duckworth, supra*, held that the *Jackson v. Virginia* standard applies to a state prisoner's claim that he was "denied due process of law because he had been convicted upon evidence allegedly insufficient to prove beyond a reasonable doubt that he was sane at the time the victim was killed," the applicable state law required the prosecution to prove the defendant's sanity beyond a reasonable doubt. *See Moore*, 443 U.S. at 713-14; 99 S. Ct. 3088. A state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law when there is a "lack of holdings from" the Supreme Court on the particular issue. *Carey v. Musladin*, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

> ii.   Assuming Florida law prior to enactment of Fla. Stat. § 775.027(2) is the relevant state law and that the State bore the burden of proving petitioner's sanity

If this Court determines that the more favorable state law standard governs petitioner's case, and that the ultimate burden on the issue of sanity rested with the

prosecution, the state appellate court reasonably could have concluded that the evidence in support of petitioner's convictions was constitutionally adequate. A brief synopsis of only that evidence most favorable to the State reveals the following facts.

State's witness Randolph Linschoten testified that he worked as an emergency paramedic for at least fifteen years. (Ex. G, p. 42). Linschoten was a hospital corpsman in the Navy, then went to paramedic school, and was in nursing school at the time of trial. (*Id*.). For the past five years, Linschoten worked for the Escambia County Emergency Medical Services as a road paramedic. (*Id*., pp. 41-42). Linschoten responds to 911 emergency calls. (*Id*., pp. 42-43). For 2 ½ years, Linschoten was a bouncer at a military bar in Hawaii where he encountered people drinking alcoholic beverages. (*Id*., pp. 49-50).

Shortly after 8:00 p.m. on October 31, 2003, Linschoten responded to an emergency call at the Oak Crest Bar on Fairfield Drive in Pensacola. (*Id*., p. 43). Linschoten was dressed in a uniform with a large insignia on the chest and on the shoulders indicating that he worked for emergency medical services. Linschoten arrived in a big red, white and blue truck with the lights and sirens activated. (*Id*., p. 55).

Linschoten observed that petitioner had a half moon shaped cut to his forehead or top of his head. (*Id*., p. 49). Linschoten saw petitioner bleeding from his head standing near the front door to the bar. Petitioner was surrounded by three people, who were trying to calm him down. (*Id*., p. 43). Petitioner tried to get away from the people by darting between two cars and heading for Fairfield Drive, where the traffic was heavy. (*Id*., p. 44). Petitioner was bleeding a lot from the injury to his head. (*Id*.). The blood was all over petitioner's head, running down his face and chest, on

his arms, and on his clothes.  (*Id*., p. 69).  Petitioner appeared conscious, alert, and intoxicated.  (*Id*.).

Linschoten tried to keep petitioner between the two cars to prevent petitioner from running into the busy street and getting hit.  (*Id*., pp. 44, 70).  Linschoten grabbed one of petitioner's arms.  (*Id*., p. 45).  Petitioner yelled, screamed and cursed Linschoten.  (*Id*., p. 46).  Petitioner jerked his hand free and came at Linschoten with both hands.  (*Id*., p. 47).  Linschoten called for a signal 36 on the radio attached to his shoulder, which meant he was in imminent danger.  (*Id*., pp. 50-51).  Linschoten ducked, caught petitioner's arm, spun him around, and put him on the ground.  (*Id*., p. 47).   Due to Linschoten's evasive action, petitioner did not actually strike Linschoten, but petitioner did wrap his arms around him. (*Id*., p. 75).  Linschoten had blood on his face, arms, shoulders, the front and back of his shirt, and on his neck. (*Id*., pp. 52, 75-76).  Petitioner threw blood at Linschoten.  (*Id*., p. 48).  There was an extreme smell of alcohol on petitioner's breath.  (*Id*., p. 49).

Other units arrived and assisted.  (*Id*., p. 52).  Petitioner continued to fight as he was put on a backboard and into a C-collar to immobilize him in the event he was more injured than it appeared.  (*Id*., p. 53).  Petitioner resisted by moving his arms about, rolling back and forth, yelling, screaming, cursing, and slinging blood everywhere. (*Id*., p. 53).  Additional restrains were required to immobilize petitioner, who was using his arms to try to hurt everybody.  (*Id*., p. 54).

Petitioner was still combative inside the ambulance.  (*Id*., p. 55).  Since petitioner no longer had free access to his arms, he started spitting on anyone he could.  (*Id*., p. 56).  Petitioner spit blood.  (*Id*., p. 69).  Petitioner spit on Linschoten. (*Id*., p. 56, 76).  Linschoten put an oxygen mask on petitioner.  (*Id*., p. 56).  Petitioner

spit in the mask.  (*Id*., p. 56).

Petitioner was transported to the emergency room at Baptist Hospital.  (*Id*., p. 59).  Petitioner screamed, yelled, and was very combative.  (*Id*., p. 59).  Petitioner disrupted the whole emergency room.  (*Id*., p. 60).  When the oxygen mask was removed, petitioner started spitting again.  (*Id*., p. 60).

During Linschoten's contact with petitioner, petitioner "was clear in thought, and he knew exactly who he was and where he was."  (*Id*., p. 61).  Petitioner knew that the people around him were emergency and hospital personnel, who were trying to treat him.  (*Id*., p. 61).  Linschoten's care report on petitioner that was made the night of the incident was admitted into evidence as State's Exhibit 1.  (Ex. H).  The report indicated that petitioner was extremely combative and smelled of alcohol.  (Ex. G, pp. 64-65 and Ex. H).  Petitioner's pupils reacted equally, and appropriately, which indicated that he did not have a head injury, other than a superficial cut to his head.  (*Id*., p. 65 and Ex. H).  Petitioner appeared oriented pursuant to the Glasgow coma scale; he just refused to obey commands.  (*Id*., pp. 66-67 and Ex. H).  On cross-examination, Linschoten testified:

> Q [Defense Counsel].  Now in regard to the totality of this behavior, slinging blood, heading toward the road, attempting to swing at you, continuously cursing, have you ever encountered anybody who acted crazy like that before?
>
> A [Mr. Linschoten].  I wouldn't' say crazy, but yes, I have experienced a lot of different behavior.
>
> . . . .
>
> Q.  And what kind of situations cause people to act like that, in your experience?

A.  When I was a bouncer at that military bar, I've encountered many many combative people that were intoxicated.

Q.  Have you encountered combative people who weren't intoxicated?

A.  Yes, Sir.

Q.  What kinds of problems were they suffering from?

A.  Any manner of medical problems can cause somebody to have an altered mental status.  Diabetics are notorious for being extremely combative when their blood sugar is low, and also people that have head injuries can be combative as well.

Q.  Have you ever seen, in your 15 years . . . Baker Act patients become combative?

A.  Yes, sir, I have.

. . . .

Q.  Does that [spitting in mask] seem like clear, coherent thinking and behavior to you?

A.  I guess not, sir.

Q.  Now, the test that you mentioned, the pupils test . . .[i]sn't that specific for intra cranial pressure such as a hematoma or from a fractured skull?

A.  Yes, sir.

Q.  Would that necessarily tell you whether someone had suffered a concussion?

A.  Not necessarily, but it's a good indicator.

. . . .

(Ex. G, pp. 71-75).  On re-direct, Linschoten testified:

> Q [Prosecutor].  In your 15 years you have dealt with drunk people, you have dealt with injured people, you have dealt with people that have mental problems?
>
> A [Mr. Linschoten].  Yes, sir, I have.
>
> Q.  When you encountered people with head injuries that cause them to behave aggressively or abnormally what other – are there any other things about the way they act that lets you know, through your training and experience, that this is a head injury you are dealing with as opposed to some other causation?
>
> A.  With the tools that I am provided, one of which is the pupil test, as a quick go by, another one is the Glasgow Comma [sic] Scale, and that is specifically what that is for.  If they are not able to satisfy those or if any of those shows deficit, then I have an indication of – suspicion that there's a head injury.  And also, when someone has a head injury and they are not alert because of the head injury, they are not going to answer to their name, be able to form words, move their arms and legs in a coordinated fashion, spit at people.  You know. They will be forming sounds but no words.  They will be moving in a random fashion, flailing about instead of trying to hit and push off, that type of thing.  It's more of a random chaotic versus a cognitive purpose.
>
> Q.  Their actions and their words, if there are any, do they – someone that you have encountered in your training and experience with head injuries, are these people then acting in a consistent fashion during an encounter with them or are they kind of incoherent?
>
> A.  People with head injuries are usually incoherent.
>
> Q.  The person that you encountered, Alan Robinson, did he seem to be coherent?

A.  Yes, sir.

Q.  Was he consistent throughout your contact with him in the types of things he was saying?

A.  Yes, sir.

Q.  And the type of things he was doing?

A.  Yes, sir.

Q.  Whether he was spitting in a mask on his face or not, if he was angry or furious or drunk, is it consistent with what else he was doing?

A.  Yes, sir.  It was clear to all of us that he knew the difference between right and wrong.  Someone with a head injury, that's not even in the ballpark.  They are not even – they are not with us.  They are not there.

(Ex. G, pp. 76-78).

State's witness Alfred Tucker testified that he had been involved in emergency medical services since 1977 and public safety since 1972.  Tucker had worked as a police officer, a firefighter, a psychiatric attendant and, at the time of trial, worked for the Escambia County Emergency Medical Services as a paramedic field training officer.  (*Id*., pp. 79-80, 83).

When Tucker arrived on the scene, Linschoten had petitioner on the ground.  (*Id*., p. 82).  Tucker temporarily relieved Linschoten.  (*Id*., pp. 84-85).  Petitioner had a laceration on his head.  (*Id*., p. 85).  Head wounds look bad and bleed a lot, but rarely are life threatening.  (*Id*., p. 86).  Petitioner spit on Tucker numerous times.  (*Id*., p. 88).  Mr. Tucker testified as to his observations of petitioner's behavior when Tucker was trying to treat him:

Q [Prosecutor].  Was there anything else about him [petitioner] that you

saw or smelled about his appearance?

A [Mr. Tucker].  He appeared to have an odor of alcohol on his person.

Q.  Is that an odor that you are familiar with, odor of alcohol on the breath?

A.  Yeah.

Q.  Have you encountered that more than once in 20 or 30 some odd years?

A.  Yes, sir.  Alcohol – it's like if you go to a wreck, and after 8:00 o'clock at night, you need to look for the drunk if you don't find one because there's usually one on the scene.

Q.  So you have seen that often?

A.  Yes, sir.

Q.  Distinctive smell?

A.  Right.

Q.  And Mr. Robinson had that on his breath?

A.  Yes, sir.

Q.  So you maintained your position on top of him, and you are not able to let him up because he begins to struggle, and spit, and fight again. What happened next?

A.  We explained to him that we are not going to cuff him.  We are going to try and take care of him and we want to take him to the hospital.  And at this point we – I let go of the arm bar and we had the backboard behind him and rolled him over on the backboard, and put a

C-collar on him.  Which at that point he decided to go out of control again, kicking and shoving everybody.  And this continued ad nauseam, until it got so bad with him kicking and spitting that we ended up – the backboard has straps on it where you can put it across the chest, across the legs.  That wasn't sufficient enough to contain him without him trying to kick people and slap people.

We finally had to put wrist restraints on him and tie his wrists down, tie his legs down.  We had to continue to do that because he was still uncooperative, and had to put sheets tied through his knees to tie to the backboard, and tie his chest down.  Because he continued to try and do every effort he could to knock somebody, and bite somebody throughout the entire thing.

Q.  Is his focus consistent – were his words and actions all over the place or was his focus consistent on yelling at you and the officer to leave him alone?

A.  He was more or less just not – he was trying to tell us to let go of him, not particularly to leave him alone.

Q.  Was he consistent in what he was complaining and screaming and cussing about?

A.  Yes.  And we consistently tried to treat him as we would like to be treating anybody that has an injury or the possibility of an injury.

Since my understanding from Linschoten, and looking at the rail and the side of the truck, and the area, was that he could have a serious head injury.   Although he did not appear to have any loss of consciousness or anything, or altered mental status, except as influenced by maybe some alcohol.

Q.  Let me go back through those.  No loss of consciousness.  In your some 30 odd years in this field, have you encountered head injuries before?

A.  Yes, sir.

Q.  What is the significance of loss of consciousness as relates to a head injury?

A.  Usually if you have a loss of consciousness, then you have a closed head injury.  The pattern is consistent.  They will stay the same way for awhile as if they have a concussion and they are disoriented.  Versus Mr. Robinson, you could talk to Mr. Robinson for a few minutes.  He would calm down.  And then anything anybody said in the area would fire him off again, or if you tried to do something and tell him, I am going to put a bandage on you, wipe the blood out of your face, he would start cussing you at any opportunity, for any perceived insult to him.

        I am not sure exactly what was setting him off.  But he would have a lucid interval.  He was just normal like you and I, and talk for a couple of minutes.  And then go berserk again at anything anybody said or anything anybody was doing.

Q.  And I think you also said that there were no signs of an altered state of mind; is that what I understood you to say?

A. No.

Q.  I'm sorry.

A.  He was not lethargic, as if he had been knocked out and continued to have an altered level or state of consciousness or anything like that.  You could talk to him for a moment, knew what was going on.  And he would calm down and then go back to the same scenario again repeatedly.

Q.  And in your experience, have you been around people that are intoxicated before?

A.  Yes, sir.

Q.  Were the defendant's actions consistent with someone in your experience that you have seen intoxicated?

A.  Yes, sir.

(Ex. G, pp. 89-92).

On cross examination, Tucker answered that except for the odor of alcohol about petitioner, petitioner did not necessarily seem to be impaired; there was no slurred speech.  (*Id*., p. 98).  Tucker legally cannot accept an intoxicated persons' refusal to be treated.  (*Id*., p. 97).  While being restrained, petitioner cursed and said to leave him alone.  (*Id*., p. 98).  Petitioner would listen and say okay when told that he was going to be treated, but then as soon as the treatment started, he became aggressive again.  (*Id*., p. 98).  Tucker has encountered patients who were combative due to a low blood sugar, diabetes, and seizures, and also Baker Act patients who were combative.  (*Id*., p. 99).

On re-direct examination, Tucker testified:

Q [Prosecutor].  Did it appear – in your dealings with Mr. Robinson, did he appear to understand what was going on around him?

A.  He appeared to understand me, and then just decide that he didn't want to be cooperative at some other point.

. . . .

A.  As soon as you relaxed any control of him, he went back to the same thing again.  As long as you were in control of him, he was very quiet and would do anything you asked him to do, as long as you were forcefully in control of him.  But if you tried to do anything to relax and talk to him and treat him as you would any normal person, is when [he] elected to start becoming aggressive again, shoving, kicking, spitting, cussing.

Q.  Did he appear to be able to do what you were asking him to do?

A.  He appeared to.  It's like he would let you do it long enough until he was able to be in control again.  And then he wanted to exercise control of the situation.  So as soon as you let go of him long enough to allow him to exercise control of hisself [sic], he wouldn't – he would go back doing the same thing agin.

Q.  Just unwilling to do what you instructed him to do ?

A.  Unwilling to do it.
. . . .

Q.  The experience with the defendant, was it consistent with what you have seen of people who are intoxicated or on substances before?

A.  The intoxication level – my opinion was that he had enough alcohol on board to not exercise any restraint – much restraint of his character. He didn't appear to be disoriented enough or apparently on any drugs, that I could discern that he was on.  It just appeared to be alcohol related with lack of restraint.  He could exercise restraint as long as you were in control of him or trying to be, and as soon as you relented and tried to treat him normally as I would any patient that had hurt themselves, and you relaxed for one second, it goes back to, I am going to exercise my own control of the situation.

Q.  So his type of behavior was more consistent with what you have seen in your 30 something years with somebody who's intoxicated?:

A.  Yes. sir.

(Ex. G, pp. 102-06).  Tucker also explained that petitioner's conduct was not consistent with patients he had seen suffering from hypoglycemic or insulin shock, or low blood sugar.  (*Id*., p. 104).  Tucker further explained that petitioner's conduct was not consistent with the conduct of patients he had seen suffering from seizures.

(*Id.*, p. 105).

Petitioner's court-appointed expert, Dr. Doenlen, testified for the defense that his conclusion was that petitioner "met the criteria for insanity at the time of the alleged crime." (Ex. G, p. 219). However, the only "mental infirmity, disease, or defect" identified by Doenlen as existing at the time of petitioner's offenses was that petitioner had bumped his head and suffered a concussion. (*Id.*, pp. 157, 218-19). Dr. Doenlen never diagnosed petitioner as suffering from a mental illness at the requisite point in time; instead, he emphasized petitioner's past history of alcoholism, drug addiction, and a "depressive disorder." (Ex. G, pp. 152, 157, 188). However, with one medical prescription exception not implicated here, evidence of voluntary intoxication is not a defense to any crime in Florida, and "is not admissible to show that the defendant lacked the specific intent to commit an offense and is not admissible to show that the defendant was insane at the time of the offense." Fla. Stat. § 775.051 (2003). Moreover, a "depressive disorder," even if it existed at the requisite point in time, does not establish an insanity defense in Florida. *See Patton v. State*, 878 So.2d 368, 375 (Fla. 2004) ("Because Dr. Toomer called Patton's condition a 'disorder,' and was unable to diagnose Patton with a specific mental disease or defect, the legal definition of insanity was not met. This is true even in light of Dr. Toomer's expert opinion that Patton was insane at the time of the crime. The difference between a disorder and a disease is not insignificant.").

Dr. Doenlen also opined that several factors contributed to petitioner's' state of mind at the requisite point in time. First petitioner had a history of making poor decisions based on his past psychiatric illness and substance abuse. (Ex. G, pp. 156-57). However, petitioner's past psychiatric history was irrelevant to whether

petitioner was insane at the time of his offenses.  The only relevance would be to establish petitioner's diminished capacity, which is not the same as insanity, and is not a legally recognized defense in Florida.  *Chestnut v. State*, 538 So.2d 820 (Fla. 1989).  Another factor identified by Dr. Doenlen was that petitioner "had been drinking." (Ex. G, p. 157).  As previously noted, voluntary intoxication from alcohol or drugs is not evidence of insanity.  Fla. Stat. § 775.051.  A third factor identified by Dr. Doenlen was that petitioner had bumped his head and suffered a concussion.  (Ex. G, pp. 156-57, 218-19).  However, the concussion was not serious enough to even justify a hospital admission.  After being treated in the emergency room, petitioner was released to the custody of the police.  (*Id*., pp. 149-50, 175).

Under Florida law, sanity is a question of fact for determination by the jury, regardless of who bears the burden of proof on the issue.  *Holmes v. State*, 374 Fo.2d 944 (Fla. 1979).  "[E]xpert testimony is not binding on the trier of fact."  *Fisher v. State*, 506 So.2d 1052, 1054 (Fla. 2nd DCA 1987); *Gryczan v. State*, 726 So.2d 345, 346 (Fla. 4th DCA 1999) ("It is well settled that sanity is a question for the trier of fact to be determined from all of the evidence, and that expert testimony is not conclusive on the issue of sanity.") (citations omitted)).  "[L]ay testimony concerning a defendant's actions may be sufficient to meet the state's burden of proving that the defendant is sane beyond a reasonable doubt."  *Bourriague*, 820 So.2d at 998 (holding that the trier of fact could interpret state trooper's detailed testimony concerning defendant's attempts to elude arrest as being inconsistent with defendant's assertions of insanity; thus it was unnecessary for state to obtain specific opinion evidence concerning sanity); *Gryczan*, 726 So.2d at 346 ("The state need not offer opinion evidence in rebuttal and may satisfy its burden by relying simply on lay

witnesses' testimony as to their perceptions of the defendant's sanity."); *State v. Van Horn*, 528 So.2d 529, 530 (Fla. 2nd DCA 1988); *State ex rel. Bludworth v. Kapner*, 394 So.2d 541, 543 (Fla. 4th DCA 1981) ("Expert testimony, even when uncontradicted, is not conclusive on the issue of sanity and the trier of fact may find such testimony adequately rebutted by the observations of laymen."); *Butler v. State*, 891 So.2d 1185, 1186 (Fla. 4th DCA 2005) (finding that "the testimony of [lay] witnesses, as well as the cross-examination of the defendant's experts, amounted to sufficient evidence from which the jury could have found against appellant on the issue of insanity.").

Here, the State presented detailed lay opinion testimony concerning petitioner's actions at the time of the incident.  The lay witnesses personally observed petitioner's actions at the time of petitioner's offense conduct.  A rational jury could have credited the State's lay evidence, interpreted the State's evidence as inconsistent with petitioner's assertions of insanity, rejected petitioner's expert's testimony, and found beyond a reasonable doubt that petitioner was sane at the time of his offenses.  The state appellate court reasonably could have concluded that under the standard enunciated in *Jackson v. Virginia*, the evidence in support of petitioner's convictions was constitutionally adequate.  *See, e.g., Conlkin v. Schofield*, 366 F.3d 1191 (11th Cir. 2004) (rejecting federal habeas relief on Georgia state prisoner's claim that evidence was insufficient to support his conviction of murder because the evidence only showed that he killed the victim in self-defense; viewing the evidence in the light most favorable to the prosecution, the jury could have found the essential elements of murder, including malice aforethought, beyond a reasonable doubt).

CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining the meaning of this term) (citation omitted). Therefore, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is ORDERED:

The clerk shall change the docket to reflect that Kenneth S. Tucker has been substituted as respondent in this cause.

And it is respectfully RECOMMENDED:

1. That the petition for writ of habeas corpus (doc. 1), challenging the

convictions and sentences in *State of Florida v. Alan Gray Robinson* in the Circuit Court for Escambia County, Florida, Case No. 03-CF-5265 be DENIED, and the clerk be directed to close the file.

2.  That a certificate of appealability be DENIED.

At Pensacola, Florida this 14th  day of February, 2012.


/s/ *Charles J. Kahn, Jr.*
CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE




NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).